WAR FINANCE CORPORATION v. JESSE DAVENPORT et al.

Middle Section.    September 28, 1926.

Petition for Certiorari denied by Supreme Court, July 15, 1927.

1. **Principal and agent.** An agent having authority to compromise or make settlement of claims has power to do the usual and necessary things accompanying such a settlement.

   Ordinarily an agent with authority to compromise or make settlement of claims or accounts for his principal has implied power to do the usual and necessary things to effect such compromise or settlement. But the agent has no implied power to make unusual settlements or agreements that impose upon the principal new liabilities or deprive him of his claim or securities.

2. **Principal and agent. Evidence.** Evidence held sufficient to show that agent had authority to make compromise and that acts of agent were not beyond its authority.

   In an action to recover on a note where the plaintiff held certain collateral and the maker of the note gave the plaintiff authority to collect the collateral and make compromise settlements and the plaintiff did make certain compromise settlements which the evidence showed were reasonable, held that the agent had the implied power and authority to do these things and the maker of the note could not complain.

3. **Appeal and error.** A grantor, having conveyed all his interest in the property, has no right of appeal from a decree setting aside the conveyance as fraudulent.

   Where certain conveyances were attacked as fraudulent and the grantor alone appealed, held that he having parted with all of his interest in the property has no right to complain of the decree on appeal.

4. **Husband and wife. Antenuptial agreements must be made in writing.** Under the Statute of Frauds, antenuptial agreements must be in writing, and a post nuptial settlement made in pursuance of an antenuptial agreement, is voluntary and cannot be sustained as against the rights of intervening creditors.

5. **Frauds, statute of. Evidence held insufficient to take antenuptial agreement from under the statute of frauds.**

Where an antenuptial agreement was parol and later a note was given by one of the parties to his children and thereafter a deed was executed in satisfaction of the note, held that since neither the note nor the deed mentioned the antenuptial agreement or settlement they are insufficient as a memorandum of such an agreement and do not satisfy the statute of frauds.

6. **Husband and wife. Where marriage is the only consideration in an antenuptial agreement it should be stated.**

The principle that consideration for a written agreement may be proven orally does not apply to marriage settlement and in view of the statutes it is necessary to state the consideration in the agreement.

7. **Frauds, statute of. The statute need not be pleaded when the defendant's answer does not set out any facts that would invoke the statute.**

In an action to set aside a fraudulent conveyance where the defendants simply pleaded that the conveyance was made for a valuable consideration and their answer did not disclose that the note was executed in consideration of marriage and that the defendants intended to rely upon an antenuptial agreement as the consideration, held that the statute of frauds might be invoked although it had not been pleaded specially.

8. **Husband and wife. Where an antenuptial contract is based upon a consideration other than marriage, the consideration may be proved orally.**

Where an antenuptial contract is based upon a consideration other than marriage, such as service rendered, the consideration may be shown orally.

9. **Parent and child. Services rendered may be sufficient consideration, but must be shown that there was an express contract for compensation at the time the services were rendered.**

Services rendered by child for parent may be a sufficient consideration for a deed or other contract, but it must be shown that there was an express agreement that the child should be compensated therefor at the time the services were rendered.

10. **Gifts. The promissory note of a donor is not a good subject of a gift.**

A party while solvent may dispose of his property as he pleases, but a promissory note is not a gift until payment, and if the donor becomes insolvent before payment his creditors can defeat the note.

Appeal from Chancery Court, Cannon County; Hon. W. R. Officer, Chancellor.

Affirmed.

Sterling S. Brown, of Woodbury, for appellants, S. H. Harris, et al.

J. Barrett Melton, of Woodbury, for appellee, War Finance Corporation.

CROWNOVER, J. This was a suit to recover the balance due on a note with interest and expenses incident to the collection of collateral securities, and to set aside fraudulent conveyances. The bill alleged that the First State Bank of Woodbury had been doing a general banking business, had become insolvent, and had been put into the hands of a receiver on August 10, 1923; that during the year, 1922, said First State Bank had borrowed considerable money

from the War Finance Corporation and had placed certain notes held by said bank as collateral security.

That in order to obtain said loan the complainant required the directors of said First State Bank to sign what was known as a collateral personal guaranty in the sum of $45,835.45, which was signed by eleven directors, including appellant, S. H. Harris.

That after said First State Bank was placed in the hands of the receiver it still owed the War Finance Corporation a balance on said indebtedness evidenced by a note of $34,365.39 due December 15, 1923, which note provided for five and one-half per cent interest from June 15, 1923, and that it held as collateral notes in the sum of $46,136.

That after said First State Bank was placed into the hands of the receiver the defendants, directors of said bank, including appellant, S. H. Harris, signed a waiver or consent agreement, authorizing said War Finance Corporation to collect said collateral notes and apply the same on said indebtedness, which waiver authorized said corporation to renew, extend or compromise any or all collateral obligations held by it as may be deemed to its best interest, and to compromise and adjust conflicting claims that might arise on the collateral securities.

The bill further alleged that the War Finance Corporation proceeded to collect the collateral securities and after it had collected as much as possible the said First State Bank owed a balance of $18,386.64 with five and one-half per cent interest from December 15, 1923, and that the expenses of collecting the same amounted to $1,268.79, for which the said complainant sought a recovery against said guarantors.

The bill further alleged that defendant, S. H. Harris, being one of the guarantors did on October 15, 1923, join his wife in conveying one farm of one hundred and twenty acres, another farm of fifty acres, a house and lot and some shares of stock to his children for the recited consideration of $20,000, which conveyance the complainant insisted was fraudulent as no consideration was paid, and the bill sought to set aside said conveyance as fraudulent.

The defendant, S. H. Harris, and his children, the grantees in said deed, were all made defendants and filed an answer denying that said conveyance was fraudulent and denying that S. H. Harris was liable to said War Finance Corporation as guarantor or otherwise, and insisted that all the collateral notes were ample security for the indebtedness, and that said War Finance Corporation could have collected all of said notes but instead delayed and permitted them to renew until many of the makers had become insolvent. They also pleaded that several of the original notes that had been executed to the War Finance Corporation had been renewed to the First State Bank, which bank had traded the renewals to the Fourth

and First National Bank at Nashville and other renewals to the Hamilton National Bank of Chattanooga, and that after said First State Bank had been placed into the hands of the receiver, said War Finance Corporation entered into an agreement with the said receiver, the Fourth and First National Bank and the Hamilton National Bank, whereby it was agreed that wherever said notes had been duplicated by renewals and traded to other banks that it would collect said notes and divide the proceeds with such bank holding the duplicates, and in this way several thousand dollars had not been accounted for, which in fact should have been credited on the note sued on. They filed their answer as a cross-bill and asked to be subrogated to the rights of the War Finance Corporation on all the other collateral now held by the War Finance Corporation.

Many depositions were taken and read to the Chancellor, who decreed that the said guarantors, including S. H. Harris, were liable to the War Finance Corporation for the balance of principal on said note in the sum of $13,147.22, interest thereon, $1,964.41, and expenses incident to the collection of the collateral notes, $1,268.-79, making a total of $16,380.42; and that the deed executed by S. H. Harris to his children conveying the farms and property was fraudulent and should be set aside, except as to the interest of the son, Walter Harris, which had been levied upon, sold and bought in by F. C. Allison, in the one hundred and twenty-acre tract of land. The Chancellor further declared a lien on the said property from the date of the filing of the original bill and ordered the land sold. He further decreed that the guarantors should be subrogated to the rights of the War Finance Corporation on the balance of the uncollected notes held by said corporation when said guarantors had paid the amount of the recovery.

The defendant, S. H. Harris, alone, appealed on the pauper's oath, and has assigned errors to the effect that the Chancellor erred:

(1) In rendering the decree against the guarantors as there was no proof of the actual amount of the balance due on said note.

(2) The other three assignments of error go to the proposition that the Chancellor erred in decreeing that the deed from S. H. Harris to his children was without consideration, fraudulent and void and that the property should be sold in satisfaction of the decree.

The one determinative question in this suit is whether the complainant is entitled to recover the amount decreed by the Chancellor.

After an examination of the record, we are satisfied that there is no error in the decree of the Chancellor. Appellant, Harris, insists

that the War Finance Corporation had no authority to compromise the collateral securities and to agree to retain only one-half of the notes, renewal duplicates of which had been executed to the First State Bank and fraudulently put up as collateral security with the Fourth and First National Bank and the Hamilton National Bank. In other words, that it had no right to pay one-half of the amount of such notes to the bank that held the duplicate renewals. The guaranty signed by Harris and the other directors provided that they jointly and severally guaranteed the prompt payment at maturity of all notes and obligations executed by the First State Bank to the War Finance Corporation up to the amount of $45,835.45, with interest at the rate of five and one-half per cent per annum and all costs and expenses incurred in the collection of the same.

They further authorized the War Finance Corporation to exchange and renew the obligations and to take additional or exchange security and to release any or all securities without in any manner impairing their joint and several liability.

The guaranty further provided that the War Finance Corporation was not required first to proceed against or exhaust its remedy against the First State Bank or to collect the collateral security.

After the First State Bank was placed in the hands of the receiver the defendant, S. H. Harris, and the other directors signed a waiver agreement obligating themselves up to the sum of $45,-835.45, and agreeing that the said War Finance Corporation might administer and collect the collateral securities as it might deem to its best interest and in its own control and discretion, that it might renew, extend, or compromise any and all collateral obligations, held by it and might grant any indulgence, settlement, forbearance, or release of security, or of the proceeds of sale of mortgaged property by the corporation. It also provided that the corporation, if deemed to its best interest, might accept additional security or exchange security for collateral securities now held or for property securing the same, or may compromise and adjust conflicting claims to any such collateral securities, and that the guarantors would pay all expenses of the collection of the collateral, including reasonable expenses of the collecting agents, and other costs and expenses paid and incurred in collection.

Ordinarily an agent with authority to compromise or make settlement of claims or accounts for his principal has implied power to do the usual and necessary things to effect such compromise or settlement. 2 C. J., 652, sec. 298. But the agent has no implied power to make unusual settlements or agreements that impose upon the principal new liabilities or deprive him of his claim or securities. 2 C. J., 653, sec. 299; Husse v. Cross, 53 S. W., 936. The agent has no power to substitute the security, or to release the claim on part payment, unless the appointment or its surrounding

circumstances make it clear that the agent is so empowered to compromise or to release in his discretion. 2 C. J., 654, sec. 300. Where the agent surrenders securities without authority he is liable for the amount. 2 C. J., 726, sec. 388. But the principal is bound where he gives the agent general authority with discretionary powers. 1 Am. & Eng. Ency. of Law, 2 Ed., 992, note 1.

Compromise agreements may be set aside or impeached for any cause· sufficient to invalidate other contracts, such as incapacity of parties, undue influence, duress, failure of consideration, fraud, accident, or mistake, illegality, abandonment and waiver: 12 C. J., 346 to 355. But where the compromise settlement is sought to be impeached the pleading must distinctly allege the grounds relied on. 12 C. J., 358.

As has thus been seen, the guarantors authorized the War Finance Corporation to collect the collateral securities and it was empowered to renew and to release securities or to accept other securities, and was given discretion to compromise and settle any and all of the collateral securities.

The proof shows that there was between three and four thousand dollars of the collateral securities collected by the corporation, one-half of which was paid to the other banks holding the duplicate notes. Now the appellant insists that it had no right to do this as the corporation was entitled to this money under the law.

The burden of proof is upon the party seeking to avoid the compromise settlement. 12 C. J., 365, sec. 79. The War Finance Corporation was given authority to compromise if in its discretion it was to its best interest. The receiver and the others agreed to the compromise, and we have no proof in the record to show that this discretion was abused.

There is no proof in the record to show that the War Finance Corporation was entitled to collect its notes where duplicates had been made and transferred to the other banks, to the exclusion of the other banks. It is not shown that the notes held by the War Finance Corporation as collateral were negotiable, nor is it shown that the War Finance Corporation was an innocent holder of such paper, or what equities existed between the First State Bank and the other banks. But the proof does show that there was a balance of $13,147.22 due on the note held by the War Finance Corporation. Where one pleads payment, the burden is on him to show such payment. Where claims are contested and there is chance of loss the agent, if given authority to compromise, has a right to make such compromise, and we think that the War Finance Corporation was given such authority; hence, there is nothing in this assignment of error.

The other three assignments of error complain as to the action of the Chancellor in decreeing that the deed from Harris to his children was without consideration and was fraudulent. None of the grantees have appealed. The grantor, alone, appealed. He insists that he conveyed all of his interest in the property to his children and insists upon the validity of the conveyance. The grantor had no interest in the property after he executed and delivered the deed that would authorize him, by appeal, to impeach the decree subjecting the property to the satisfaction of complainant's debt; hence, he has no right to complain. See, Hunt v. Childress, 5 Lea, 247. It results that these three assignments of error must be overruled.

All of the assignments of error having been overruled, the decree of the Chancellor is affirmed. A decree will be entered here for $13,147.22, principal, with interest thereon at the rate of five and one-half per cent from December 15, 1923, and also $1,268.79, expenses of collecting the collateral security, all of which is declared to be a lien on the property described in the decree below. The defendant, Harris, will be allowed sixty days from the entry of this decree in which to pay the sum, in default of which it is ordered that the property, described in the decree below, be sold, according to law, in satisfaction of this decree, and the cause is remanded to the chancery court of Cannon county for the purpose of selling the property in accordance with this decree, under proper orders made by the Chancellor. The cost of the cause, including the cost of appeal, is decreed against appellant and will be paid out of the sale of said property.

Faw, P. J., and DeWitt, J., concur.

## OPINION ON WRIT OF ERROR.

This suit was disposed of last year on appeal of S. H. Harris. His children have now presented the record for a writ of error, and insist that the conveyance made by Harris to them was not fraudulent, but was made by their father in pursuance of an antenuptial agreement made with his second wife in consideration of marriage.

Harris had been twice married. His first wife was the mother of his children and was dead. His second wife had been married before and had children. Each of them had property. They on February 23, 1921 agreed to marry and verbally agreed that the property then owned by each should go to the respective children. Mrs. Harris executed a proper instrument to convey her property to her children, but S. H. Harris consulted a friend about drafting a will for the disposition of his property, and was advised to execute a note to them for $20,000, the estimated value of his property. He accordingly, on February 23, 1921 executed a note for $20,000

to his three sons and directed in said note that when collected, it should be divided among his children and grandchildren, naming them.

The note recited "For value received and for the further consideration that I justly owe my children and grandchildren, under an agreement heretofore made, I promise to pay to the order of S. C. Harris, J. A. Harris and R. H. Harris ·twenty thousand dollars. Same is due and payable upon demand," etc.

Harris and his second wife were married on February 27, 1921. He signed the guaranty to the bank on November 9, 1922. The bank became insolvent and a receiver was appointed on August 9, 1923. Harris signed the waiver and consent agreement on October 20, 1923, and on October 5, 1923 he and his present wife executed the deed conveying the property in controversy to his children and grandchildren. ,The deed recited that Harris was indebted to them in the sum of $20,000, evidenced by said note dated February 23, 1921; and he conveyed the property in consideration of $1 cash and in satisfaction of said note, but the $1 was not actually paid.

His children now insist that the Chancellor erred

(1)    In holding that the note executed by Harris to them was not a valid gift.

(2)    In holding that the sale of the land by Harris to them was fraudulent and void.

(3)    In setting aside the sale and in ordering the land sold in satisfaction of the decree against Harris and others.

By these assignments of error it is insisted that the conveyance was not fraudulent, as it was made in satisfaction of said note which Harris actually owed them, and that the note was executed in pursuance of an antenuptial agreement made by Harris and his wife in consideration of marriage. After another examination of the record, we think that none of the assignments are well made and must be overruled. Under the statute of frauds, autenuptial agreements must be in writing, and a post-nuptial settlement made in pursuance of an antenuptial agreement, is voluntary and cannot be sustained as against the rights of intervening creditors. See 27 C. J., 128, sec. 7, and page 542, sec. 238; See Shannon's New Code, sec. 3142, sub-sec. 3, notes 102 and 103; Caines v. Marley, 2 Yerg., 582; Smith v. Greer, 3 Humph., 118.

The antenuptial agreement was parol, and as neither the note nor the deed mentioned the antenuptial agreement or settlement, they are insufficient as a memorandum of such an agreement made in consideration of marriage. In order to satisfy the statute of frauds, the entire agreement must be in writing. It cannot be partly in writing and partly in parol. See 27 C. J., 267-9, secs. 318-319; McCarty v. Kyle, 4 Cold., 348; Sheid v. Stamps, 2 Sneed, 172.

It is insisted that the consideration need not be stated in a deed or in a note, but may be proven by oral testimony. Ordinarily, a consideration is not regarded as a part of the contract, but only an inducement to it, and therefore is not required to be stated in the instrument, as parol evidence is admissible to supply the consideration when omitted. 27 C. J., 280, sec. 341, page 384, sec. 476; Whitby v. Whitby, 4 Sneed, 473.

But obviously this principle does not apply to marriage settlements, as the statute provides that no action shall be brought, whereby to charge any person upon any agreement made upon consideration of marriage, unless there is some memorandum or note of the agreement in writing signed by the party to be charged. So where marriage is the consideration, it should be stated in the antenuptial agreement.

It may be insisted that the statute of frauds should have been expressly pleaded, which was not done in this case. It is well settled, as a general rule, that a party seeking to avail himself of the benefits of the statute must call the court's attention to it and distinctly plead it in some manner, or it will be waived, but this principle does not apply where the pleading is in such form that it does not disclose the real nature of the claim sued on, or the defense made, in which events the statute is available although not specially pleaded. See 27 C. J., 371, sec. 450.

This was a suit to set aside a fraudulent conveyance. The defendants simply pleaded that the conveyance was made for a valuable consideration, and their answer nowhere discloses the fact that the note was executed in consideration of marriage, or that the defendants intended to rely upon the antenuptial agreement and marriage as the consideration; hence we think it clear that it was not incumbent upon the complainant to specially plead the statute of frauds, as he had no notice of the antenuptial agreement.

There is some insistence that the conveyance was executed in consideration of marriage and for past services rendered. If the conveyance had been made in consideration of past services rendered, we do not think that it would have been necessary to have stated it in the writing, as where there is some other consideration, in addition to marriage sufficient to support the oral agreement, the contract may be enforced as not within the provisions of the statute. 27 C. J., 127. But in this instance the conveyance cannot be upheld on consideration of past services rendered as there was no proof of such services actually rendered, or their value, or that there was any agreement to pay for the services rendered at the time they were rendered. Had sufficient services been rendered to equal the value of the property, the court will presume that the services were gratuitous, unless there was an express agreement

that the child should be compensated therefor at the time services were rendered. See Forsee v. Matlock, 7 Heisk., 421-5; Gorrell v. Taylor, 107 Tenn., 568-570, 64 S. W., 888.

However there is no proof about the services and their value, and there is no assignment of error making this insistence.

It is further insisted that the note itself having been executed when S. H. Harris was solvent and before he became liable on the guaranty to the bank, he had a right to give his property to his children. It cannot be questioned that one who is not in debt and has no intention of evading future indebtedness, may dispose of his property as he sees proper; but one cannot dispose of his property by the execution and delivery of a note to his children. The promissory note of a donor is not a good subject of a gift. It is a mere promise to pay in the future and not complete until payment, and cannot be enforced against the donor or his estate after his death. See Shugart v. Shugart, 111 Tenn., 179, 76 S. W., 821.

It results that all the assignments of error must be overruled, and the decree of the Chancellor is affirmed. A decree will be entered here in accordance with the previous opinion rendered by this court in this case. The costs of the cause, including the cost on this writ of error, is decreed against appellants and surety on the bond for writ of error, for all of which let execution issue.

DeWitt, J., and Henderson, Special J., concur.